IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

HUNTINGTON DIVISION

MARK E. DUNCAN,                          )
    Plaintiff,                    )
              )
v.                                       )   CIVIL ACTION NO. 3:15-08287
              )
CAROLYN. W. COLVIN,                      )
Acting Commissioner of Social Security,  )
    Defendant.                    )

PROPOSED FINDINGS AND RECOMMENDATION

  This is an action seeking review of the final decision of the Commissioner of Social Security denying the Plaintiff's application for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI), under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. By Orders entered June 24, 2015, and January 5, 2016 (Document Nos. 4 and 15.), this case was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence, and to submit Proposed Findings of Fact and Recommendation for disposition, all pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the parties' cross-Motions for Judgment on the Pleadings. (Document Nos. 11 and 14.)

  The Plaintiff, Mark E. Duncan (hereinafter referred to as "Claimant"), filed applications for SSI and DIB on February 12, 2012 (protective filing date), alleging disability as of May 13, 2011, due to inability to read or write, hip injury, and shoulder problems.[1] (Tr. at 11, 199-206, 207-12, 220, 226.) The claims were denied initially and upon reconsideration. (Tr. at 53-54, 55-67, 68-80, 81-82, 83-95, 96-108, 109-11, 114-16, 125-27, 129-31, 132-34, 136-38.) On November 13, 2012, Claimant requested a hearing before an Administrative Law Judge (ALJ). (Tr. at 139-40.) A hearing was held on December 18, 2013, before the Honorable Maria Hodges. (Tr. at 31-52.)  By decision dated January 16, 2014, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 11-26.) The

---

[1] Claimant reported in his Disability Report – Appeal, dated November 13, 2012, that his shoulder problems had

ALJ's decision became the final decision of the Commissioner on April 27, 2015, when the Appeals Council denied Claimant's request for review. (Tr. at 1-6.) Claimant filed the present action seeking judicial review of the administrative decision on June 24, 2015, pursuant to 42 U.S.C. § 405(g). (Document No. 2.)

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(I), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. §§ 404.1520, 416.920 (2014). If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. §§ 404.1520(a), 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. §§ 404.1520(b), 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. §§ 404.1520(d), 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. 20 C.F.R. §§ 404.1520(e), 416.920(e). By satisfying inquiry four, the claimant establishes a prima facie case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. §§ 404.1520(f), 416.920(f) (2014). The Commissioner must show two things: (1) that the

---

worsened, which resulted in limited mobility. (Tr. at 256.)

claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration "must follow a special technique at every level in the administrative review process." 20 C.F.R. §§ 404.1520a(a) and 416.920a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in 20 C.F.R. §§ 404.1520a(c) and 416.920a(c). Those sections provide as follows:

> *(c) Rating the degree of functional limitation.* (1)Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.
>
> (2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.
>
> (3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. See 12.00C of the Listings of Impairments.
>
> (4) When we rate the degree of limitation in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace) and "none" in the fourth (episodes of decompensation) will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. 20 C.F.R. §§ 404.1520a(d)(1) and 416.920a(d)(1).[2] Fourth, if the claimant's impairment(s) is/are deemed severe, the SSA compares the medical findings about the severe impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment(s) meet or are equal to a listed mental disorder. 20 C.F.R. §§ 404.1520a(d)(2) and 416.920a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the Claimant's residual functional capacity. 20 C.F.R. §§ 404.1520a(d)(3) and 416.920a(d)(3). The Regulation further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

> At the administrative law judge hearing and the Appeals Council levels, the written decision issued by the administrative law judge and the Appeals Council must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory

---

[2] 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04, provides that affective disorders, including depression, will be deemed severe when (A) there is medically documented continuous or intermittent persistence of specified symptoms and (B) they result in two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation , each of extended duration or (C) there is a medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities with symptoms currently attenuated by medication or psychosocial support and (1) repeated extended episodes of decompensation; (2) a residual disease process resulting in such marginal adjustment that a minimal increase in mental demands or change in the environment would cause decompensation; or (3) a current history of 1 or more years' inability to function outside a highly supportive living arrangement, and the indication of a continued need for such an arrangement.

findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(2) and 416.920a(e)(2).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because he had not engaged in substantial gainful activity since the alleged onset date, May 13, 2011. (Tr. at 14, Finding No. 2.) Under the second inquiry, the ALJ found that Claimant suffered from "degenerative disc and joint disease; Learning Disorder (not otherwise specified); Major Depressive Disorder; and Anxiety Disorder (not otherwise specified)," which were severe impairments. (Tr. at 14, Finding No. 3.) At the third inquiry, the ALJ concluded that Claimant's impairments did not meet or equal the level of severity of any listing in Appendix 1. (Tr. at 15, Finding No. 4.) The ALJ then found that Claimant had the residual functional capacity for light work, as follows:

> [T]he [C]laimant has the following residual functional capacity to perform light level work as that term is defined in 20 CFR 416.967(b) and 404.1567(b) except stand and walk a total of four hours in an eight-hour day, no more than one hour at a time with need to sit for 15 minutes before returning to standing/walking; never climb ladders, ropes, or scaffolds; occasionally climb ramps/stairs or balance, stoop, kneel, crouch and crawl; avoid concentrated exposure to temperature extremes and pulmonary irritants; avoid even moderate exposure to vibration and hazards; and mentally, is able to understand, remember, and carry out one- and two-step commands involving simple instructions in an environment which entails only occasional and superficial interactions with others.

(Tr. at 18, Finding No. 5.) At step four, the ALJ found that Claimant could not return to his past relevant work. (Tr. at 23, Finding No. 6.) On the basis of testimony of a Vocational Expert ("VE") taken at the administrative hearing, the ALJ also concluded that Claimant could perform jobs such as a bench worker, product inspector, machine monitor, and product grader/sorter/selector, at the unskilled, light level of exertion. (Tr. at 23-24, Finding No. 10.) On this basis, benefits were denied. (Tr. at 25, Finding No. 11.)

Scope of Review

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, the Fourth Circuit Court of Appeals defined substantial evidence as:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Nevertheless, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is not supported by substantial evidence.

Claimant's Background

Claimant was born on July 19, 1964, and was 49 years old at the time of the administrative hearing, on December 18, 2013. (Tr. at 23, 199, 207.) The ALJ found that Claimant had at least a high school education and was able to communicate in English. (Tr. at 23, 35-36, 225, 227.) In the past, he worked as a framing carpenter and general construction carpenter. (Tr. at 23, 49, 228.)

 The Medical Record

The Court has considered all evidence of record, including the medical evidence and will summarize it and discuss it below in relation to Claimant's arguments.

On May 13, 2011, Claimant was thrown from a motorcycle when it skidded on some gravel. (Tr. at 376.) Although Claimant wore a helmet, witnesses reported that he lost consciousness for an

unknown period of time. (Id.) Claimant was treated at Charleston Area Medical Center ("CAMC") for left pneumothorax with chest tube, left lower lobe pulmonary contusion, right scapular fracture, right femur fracture, multiple transverse process fractures, nondisplaced superior right facet fracture, and left retroperiotoneal hematoma. (Tr. at 378.) His right femur fracture was treated by open reduction and internal fixation. (Tr. at 380.)

On May 14, 2011, Dr. Frederick B. Armbrust, M.D., completed a neurological examination regarding Claimant's spinal injuries. (Tr. at 382.) Claimant had no complaints of back discomfort and denied any radiating discomfort in his legs or paresthesia, although he had some local discomfort of his right femur. (Id.) Physical examination revealed that Claimant was alert and cooperative and had symmetric reflexes, good muscle strength, and no gross sensory impairment. (Id.) CT scans revealed no cranial or spinal abnormality except evidence of a nondisplaced superior articular facet fracture of the lumbar spine at L5 on the right and multiple transverse process fractures in the left, with associated paravertebral psoas swelling consistent with hematoma. (Id.) Dr. Armbrust did not recommend any surgical intervention or bracing. (Id.) Claimant underwent a tube placement for the left pneumothorax and non-operative treatment of the right scapular fracture. (Tr. at 387-88, 391-93.) Prior to his discharge from CAMC on May 18, 2011, Claimant underwent blood transfusions due to acute blood loss anemia. (Tr. at 389-90.)

On June 1, 2011, Claimant presented to the general surgical clinic at CAMC with complaints of left chest soreness, decreased appetite, abdominal pain, and pain in his lower back and legs. (Tr. at 433, 439-40.) Chest x-rays revealed no acute process. (Tr. at 430.) The x-rays of Claimant's lumbar spine on June 13, 2011, revealed minor degenerative spurring but no fracture. (Tr. at 497.)

Claimant presented to Dr. Scott E. Smith, D.O., at Holzer Clinic, on June 15, 2011, and reported a family history of diabetes and that lab results from CAMC suggested that Claimant may have been diabetic. (Tr. at 451-53.) Claimant complained of pain in the anterior left thigh status post

left hip replacement and a feeling of a pulsation. (Tr. at 451.) Dr. Smith noted on examination that Claimant had some decreased range of thoracolumbar motion and dysfunction, but had equal strength in the bilateral lower extremities, as well as good sensation, pulses, and reflexes. (Tr. at 452.) Dr. Smith also noted that Claimant was depressed, anxious, or stressed. (Id.) He assessed possible aneurysm of the femoral artery, chronic obstructive pulmonary disease ("COPD") by pulmonary function testing, diabetes mellitus, and lumbar strain with contusion. (Tr. at 452-56.)

An MRI scan of Claimant's lumbar spine on October 28, 2011, demonstrated a left paracentral/foraminal disc protrusion or herniation that produced mild to moderate spinal stenosis and bilateral neural foraminal stenosis, left greater than right. (Tr. at 494.) At the L4-5 level, there was a mild bulge that minimally encroached upon the anterior aspect of the thecal sac. (Id.)

On January 16, 2012, Claimant returned to Holzer Clinic, where he was examined by Phillip Long. (Tr. at 463.) Claimant complained of mild burning into his right thigh, overall worsening of sleep pattern, and back and leg pain with radicular symptoms. (Id.) He reported that his medications provided some relief, but rated his pain at a level nine out of ten. (Id.) Claimant also reported no medication side effects. (Id.) The MRI scan of Claimant's right shoulder revealed a 14 mm separation at the acromioclavicular joint. (Id.) Claimant was referred to Dr. Shailen K. Mehta, M.D., for an epidural steroid injection. (Id.) Claimant underwent a lumbar epidural steroid injection on January 18, 2012. (Tr. at 464.) On March 1, 2012, Claimant reported continued low back pain with radiation up the spine and with numbness in the bilateral lower extremities. (Tr. at 465.) He rated the pain at a level 7.5 out of ten, with Lortab and Naproxen, and reported no relief from the epidural steroid injection. (Tr. at 465-66.) Dr. Daniel Black, D.O., noted that Claimant's overall function was a little better and noted that he suffered some nausea, itching, and fatigue with the medications. (Tr. at 466.) Dr. Black adjusted Claimant's medications, and recommended an EMG and nerve conduction study, which were normal. (Tr. at 465-68.)

On April 2, 2012, Dr. Black expressed his concern for Claimant's worsening and chronic pain, one year status post motorcycle accident. (Tr. at 469.) He noted that Claimant had tried to mow grass, was able to walk and stand, and did little work around the house. (Id.) Dr. Black recommended that Claimant return to physical therapy "basically until he collapses literally if he gets better at this time or he is going to be [a] chronic pain patient." (Id.) He therefore advised, that he would place Claimant into a chronic narcotic therapy for scenario of chronic benign pain. (Id.) On April 27, 2012, Claimant reported no change in his low back pain but an improvement in his shoulder, hip, and leg pain. (Tr. at 470.) Dr. Black challenged Claimant "to get out and do more" and recommended an active exercise program with progressive resistive exercise moving to a cardiovascular fitness program that would help him "max out" at his functional capacity. (Tr. at 471.) Claimant reported however that he was unable to obtain therapy due to financial constraints. (Id.)

On May 31, 2012, Claimant complained of left lower back pain and right shoulder pain, which he rated at a level seven to eight out of ten. (Tr. at 487.) He reported that he was compliant with his medication treatment. (Id.) Dr. Black again recommended physical therapy, to be followed by a functional capacity evaluation. (Tr. at 488.) He noted his intent to transfer Claimant back to the care of his treating physician at maximum medical improvement. (Id.)

On June 4, 2012, Claimant underwent a consultative physical examination by Dr. Rakesh Wahi, M.D., at the request of the State agency. (Tr. at 472-77.) Dr. Wahi noted that Claimant had difficulty raising his right shoulder above his head and walking due to back and hip pain. (Tr. at 472.) Claimant reported that he was able to walk one and a half miles on flat ground, could stand in one position for 20 minutes, and could sit for about 15 to 25 minutes. (Id.) He reported great difficulty sleeping and that he was able to perform most daily activities, with the exception of putting on his socks and shoes. (Id.) He reported an inability to read or write and depended on his wife to handle matters that required such abilities. (Tr. at 473.)

On physical examination, Dr. Wahi noted that Claimant was dressed and groomed poorly, that his hygiene was good, and that he was oriented fully and was cooperative. (Tr. at 474.) He observed that Claimant walked with a limp and short steps, with his back flexed anteriorly at mid-lumbar area. (Tr. at 475.) Claimant was able to get on and off the exam table with some help, squat partly, and walk on his heels and toes with some pain, but was unable to lie flat. (Id.) Dr. Wahi noted normal sensation and reflexes and normal range of motion in his left shoulder and both elbows and wrists, but decreased range of right shoulder motion. (Id.) Upper extremity strength and grip strength were normal bilaterally and Claimant had normal range of motion of his knees, hips, and ankles bilaterally. (Id.) Claimant had considerable tenderness over the left sacroiliac area of his spine. (Id.) Dr. Wahi observed that his lumbar spine was straight and that Claimant had severe paraspinal muscle spasm. (Id.) He had decreased range of motion of the lumbar spine and positive straight leg raising test at 40 degrees on the right and 90 degrees on the left sitting and 40/80 in supine position. (Id.) Dr. Wahi diagnosed severe degenerative joint disease involving the lumbar spine, functional illiteracy, and traumatic arthritis of the right shoulder. (Id.) He opined that Claimant suffered "from functional literacy where he is unable to read and write well enough to follow written instructions…[and] severe pain in his lower back, which is accompanied by findings of significant loss of movement." (Tr. at 476.)

On June 30, 2012, Dr. Curtis Withrow, M.D., a State agency reviewing medical consultant, opined that Claimant had severe impairments of the spine and joints, under Listings 1.02 and 1.04. (Tr. at 61-63, 74-76.) Dr. Withrow completed a physical RFC assessment, on which he opined that Claimant retained the ability to lift and carry 20 pounds occasionally and 10 pounds frequently, stand or walk four out of eight hours a day, sit six hours a day, and perform postural activities occasionally, except he could never climb ladders, ropes, or scaffolds. (Tr. at 62, 75.) He further opined that Claimant should avoid concentrated exposure to temperate extremes, fumes, dusts, gases, and poor

ventilation and avoid even moderate exposure to vibration and hazards. (Tr. at 63, 76.) On September 12, 2012, Dr. Narendra Parikshak, M.D., a State agency reviewing medical consultant, reviewed the record and affirmed Dr. Withrow's RFC assessment. (Tr. at 88-91, 102-04.)

On September 26, 2013, Dr. Smith conducted a physical for the purposes of Medicaid eligibility for a West Virginia Medical Card. (Tr. at 489-92.) Dr. Smith noted on physical examination that Claimant walked with a limp and seemed unable to stand erect. (Tr. at 491.) Dr. Smith further noted decreased range of thoracolumbar spine motion with spasms of the levator scapulae, rhomboideus, and paraspinal muscles. (Id.) He also observed tenderness over the bilateral sacroiliac joints. (Id.) Dr. Smith noted that Claimant had equal strength bilaterally of the upper and lower extremities. (Tr. at 492.)

_Mental Impairments_:

On July 26, 2011, Catherine Van Verth Sayre, M.A., a licensed psychologist, conducted an interview and mental status examination. (Tr. at 458-61.) Ms. Sayre observed that Claimant ambulated on crutches and appeared to have back pain, with difficulty moving around. (Tr. at 458.) He reported memory difficulties, frustration, anger, irritability, worry over minor issues, sleep problems, decreased appetite, suicidal ideation, attempted suicide when he was a teenager, depression, and feelings of hopelessness. (Id.) Claimant denied any mental health treatment. (Tr. at 459.) Claimant reported that although he graduated from high school, he felt that "they pushed him through because he was a trouble maker." (Id.) He was enrolled in special education classes, was retained in the first grade, and received D's and F's. (Id.)

On mental status examination, Ms. Sayre observed that Claimant had appropriate grooming and hygiene, clear and concise speech, an irritable mood and broad affect, normal thought process and content, good insight, and normal psychomotor behavior, immediate memory, persistence and pace, and social functioning. (Tr. at 460.) She opined that Claimant's remote memory was mildly

impaired, his judgment and concentration were moderately impaired, and his recent memory was severely impaired. (Id.) Ms. Sayre noted Claimant's daily activities to have included playing video games, watching television, petting his dog, and attempting to do laundry. (Id.)

Intellectual testing revealed a full scale IQ score of 82. (Tr. at 460.) Results of the WRAT-4 demonstrated that Claimant was capable of performing spelling at a second grade level, word reading at a third grade level, and math computation at a fifth grade level. (Id.) Ms. Sayre opined that Claimant's test results were valid given his work history, pace, persistence, and effort. (Id.) She diagnosed attention deficit hyperactivity disorder ("ADHD") NOS, learning disorder NOS, and borderline intellectual functioning. (Id.) She opined that his prognosis was poor but that he was capable of managing his own benefits. (Id.)

On July 25, 2012, Dr. John Todd, Ph.D., a State agency reviewing psychologist, completed a mental RFC assessment, on which he opined that Claimant had a non-severe organic mental disorder that resulted in mild restrictions of daily activities, no difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. (Tr. at 60, 63-64, 73, 76-78.) He opined that Claimant was not significantly limited in his ability to remember locations and work-like procedures; understand, remember, and carry out very short and simple instructions; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; sustain an ordinary routine without special supervision; work in coordination with or in proximity to others without being distracted by them; make simple work-related decisions; and complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. at 64, 77.) Dr. Todd opined that Claimant was moderately limited in his ability to understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods. (Id.) Regarding concentration, Dr. Todd noted that Claimant's physical pain may

12

intermittently interfere with his ability to concentrate, though it appeared that he was able to perform short, simple, repetitive two to three step work-like tasks. (Id.) He also opined that Claimant was functionally illiterate with a third grade reading level. (Id.)

William C. Steinhoff, M.A., a licensed psychologist, performed a mental status evaluation at the request of the State agency on October 2, 2012. (Tr. at 479-92.) Mr. Steinhoff observed that Claimant walked with a slow but steady gait, appeared to be in pain, was groomed poorly, and emanated a mild body odor. (Tr. at 479.) Claimant reported poor sleep, decreased appetite, crying spells with low energy levels, and a depressed and irritable mood. (Tr. at 480.) He reported a history of suicidal thought without attempt but denied any then current suicidal or homicidal ideations. (Id.) Claimant reported that he never learned to read or write well and obtained a driver's license upon oral examination. (Tr. at 481.) On mental status examination, Mr. Steinhoff noted that Claimant maintained fair eye contact, displayed appropriate social behaviors, exhibited coherent and relevant speech that was slow, was oriented in all spheres, had a mildly depressed mood and restricted affect, and had clear and coherent thought process. (Id.) He noted that Claimant had limited to fair insight and average judgment and normal immediate and remote memory. (Tr. at 481-82.) Mr. Steinhoff opined that Claimant's psychomotor behavior and pace were slowed, his social functioning was mildly impaired secondary to preoccupation with pain and depressed mood, his concentration and persistence were moderately impaired, and his recent memory was markedly impaired. (Tr. at 482.) Mr. Steinhoff noted Claimant's activities to have included performing his own personal care twice a week, some straightening and picking up of the house, occasionally doing dishes, preparing a simple snack, watching television, playing with the dog, listening to music occasionally, and getting up and down a lot. (Id.)

Mr. Steinhoff diagnosed major depressive disorder, single episode, severe without psychotic features; anxiety disorder NOS; and learning disorder NOS, by history. (Tr. at 483.) He noted that

13

Claimant also reported symptoms that were suggestive of panic attacks at least a few times each month. (Id.) Mr. Steinhoff opined that Claimant's prognosis was guarded and that he maintained the ability to manage his finances. (Id.)

On October 23, 2012, Dr. Rosemary L. Smith, Psy.D., a State agency reviewing psychologist, opined that Claimant's organic mental disorder, anxiety disorder, and affective disorder, were severe impairments. (Tr. at 101.) She further opined that Claimant's mental impairments resulted in mild restrictions of daily activities and moderate difficulties in maintaining social functioning, concentration, persistence, or pace. (Id.) She noted that although Claimant's social functioning was not limited significantly during the consultative evaluations, his daily activities supported a more severe deficit. (Tr. at 102.) Dr. Smith completed a mental RFC assessment on which she opined that Claimant was not significantly limited in her ability to remember locations and work-like procedures; understand, remember, and carry out very short and simple instructions; sustain an ordinary routine without special supervision; work in coordination with or in proximity to others without being distracted by them; make simple work-related decisions; ask simple questions or request assistance; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness. (Tr. at 105-06.) She further opined that Claimant was moderately limited in his ability to understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and interact appropriately with the general public. (Id.) Dr. Smith concluded that Claimant was "able to understand, remember, and carry out 1- and 2-step commands involving simple instructions in an

environment that entails only occasional and superficial interactions with others." (Tr. at 106.) In reaching her opinions, Dr. Smith reviewed the record, including the evaluations by Ms. Sayre and Mr. Steinhoff. (Tr. at 101.)

Claimant's Challenges to the Commissioner's Decision

Claimant alleges that the Commissioner's decision is not supported by substantial evidence because the ALJ failed to accommodate his moderate difficulties in concentration, persistence, or pace that she found to exist. (Document No. 11 at 11-13.) Citing Mascio v. Colvin, 780 F.3d 632 (4th Cir. 2015), Claimant contends that the ALJ's RFC assessment that limited him to understanding, remembering, and carrying out one- to two-step commands that involved simple instructions was insufficient to accommodate a moderate limitation in maintaining concentration, persistence, or pace. (Id. at 12.) He asserts that the jobs identified by the VE require an individual to maintain concentration and pace, or meet a quota. (Id. at 13.) The ALJ's failure to include all the limitations in the hypothetical question to the VE, resulted in unreliable testimony from the VE. (Id.) Claimant therefore contends that the ALJ's step five decision is not supported by the substantial evidence of record.

In response, the Commissioner asserts that the ALJ sufficiently accounted for Claimant's moderate limitations in maintaining concentration, persistence, and pace and that the ALJ's decision is supported by substantial evidence. (Document No. 14 at 9-12.) The Commissioner notes that the ALJ found that Claimant had ongoing memory function difficulties and difficulties regarding his ability to attend, concentrate, and complete tasks. (Id. at 9.) The ALJ further acknowledged Claimant's learning disorder, slowed thought processing, and limited general fund of knowledge, as well as deficiencies in concentration, persistence, and pace. (Id.)

Claimant next alleges that the Commissioner's decision is not supported by substantial evidence of record because the ALJ failed to provide an adequate explanation for her RFC finding.

15

(Document No. 11 at 13-16.) He asserts that the ALJ failed to include many of the limitations assessed by the medical experts and failed to provide a clear explanation for her limitations. (Id. at 13-14.) Citing Mascio, Claimant contends that the ALJ failed to provide the required narrative for her RFC finding. (Id. at 15.) Specifically, he contends that although "the ALJ provided a summary of handpicked medical evidence, she provided no additional analysis or explanation for the limitations she found or the reasons for her divergence from medical opinions and clinical observations in the record," as required by SSR 96-8p. (Id.) Although the ALJ indicated that she gave significant weight to the opinions of the two State agency medical consultants, both medical consultants limited Claimant to performing sedentary work. (Id.) Additionally, Claimant asserts that the ALJ failed to provide an analysis of the opinions of the two State agency medical consultants and failed to address Claimant's primary care physician's observations in September 2013. (Id. at 15-16.) Consequently, Claimant contends that the ALJ's failure to provide a proper analysis as to how she resolved conflicting evidence and formed her conclusions frustrates meaningful review by this Court. (Id. at 16.)

In response, the Commissioner asserts that the ALJ's mental RFC is capable of meaningful judicial review. (Document No. 14 at 12-13.) She asserts that the ALJ discussed and considered the opinions of Mr. Steinhoff and Ms. Sayre, but gave significant weight to the opinions of Drs. Todd and Smith. (Id. at 13.) The Commissioner asserts that the ALJ's significant reliance upon the State agency's RFC assessments was appropriate. (Id.) She further asserts that case law pre-and post-Mascio has found that a narrative discussion of the relevant evidence in support of the ALJ's findings is sufficient to comply with the function-by-function analysis

Claimant also alleges that the Commissioner's decision is not supported by substantial evidence because the ALJ erred when she failed to account for his moderate limitations in concentration, persistence, or pace. (Document No. 11 at 16-19.) Claimant asserts that the ALJ

disregarded his deficiencies in reading and writing, despite the significant evidence of record that demonstrated his illiteracy. (Id. at 16.) He asserts that the ALJ improperly rejected Dr. Wahi's opinion that he was functionally illiterate because the conclusion was outside of Dr. Wahi's expertise, was unsubstantiated at that time by formal testing, and was not diagnosed by either of the two psychological evaluators. (Id.) Pursuant to 20 C.F.R. §§ 404.1564(b) and 416.964(b), Claimant asserts that Claimant's numerical grade is determinative of educational abilities only if contradictory evidence does not exist. (Id. at 17.) In this case, Claimant contends that the record was replete with evidence that he was illiterate, including his allegations and testimony, his placement in special education classes and vocational classes, intellectual testing results, and mental status findings. (Id. at 18-19.) Claimant asserts that his illiteracy was critical at step five because pursuant to Medical-Vocational Rule 201.17, the ALJ should have awarded benefits. (Id. at 19.)

In response, the Commissioner asserts that the ALJ's finding that Claimant had a high school education was consistent with his testimony and that any error was harmless based upon the VE's testimony. (Document No. 14 at 14-15.) The Commissioner asserts that despite Claimant's allegations, he testified that he had a high school education and the ALJ specifically questioned the VE regarding the results of the WRAT-4 testing. (Id. at 14.) Consequently, the Commissioner asserts that the VE appropriately addressed questions regarding a more limited educational ability and that any error the ALJ may have committed, is harmless. (Id. at 18-19.)

Analysis.

1.  *Educational Level*.

Claimant alleges that the ALJ erred in finding that he had a high school education, ignoring results of intellectual and achievement testing, and rejecting the opinion of Dr. Wahi that he was functionally illiterate. (Document No. 11 at 16-19.) The Regulations state that the importance of a claimant's educational level "may depend upon how much time has passed between the completion

17

of your formal education and the beginning of your physical or mental impairment(s) and by what you have done with your education in a work or other setting." 20 C.F.R. §§ 404.1564(b), 416.964(b) (2014). The Regulations further state that educational abilities may not be representative of a claimant's formal education, and may be "higher or lower," if achieved many years before the impairment began. Id. The ALJ will use a claimant's grade level to determine educational abilities unless there is other evidence to contradict it. Id. The Regulations further define education to include how well a claimant is able to communicate in English. Id. As Claimant notes, illiteracy is defined in the Regulations as "the inability to read or write." 20 C.F.R. §§ 404.1564(b)(1), 416.964(b)(1). A claimant is considered illiterate under the Regulations when "the person cannot read or write a simple message such as instructions or inventory lists even though the person can sign his or her name." Id. In general, an illiterate person "has had little or no formal schooling." Id.

In this case, the ALJ found that Claimant had at least a high school education and was able to communicate in English. (Tr. at 23, Finding No. 8.) In so finding, the ALJ acknowledged that when in school, Claimant was placed in special education classes and was found to have below capacity functioning in reading recognition, reading comprehension, and spelling. (Tr. at 21.) When asked at the administrative hearing whether he was able to read, Claimant responded: "Not really, most of the reading my wife does or I have my mom if it's an important paper or something like that." (Tr. at 36.) He went on to testify that he was able to "do the fundamentals and make - - basically make out what it should be by four or five different words...I can make out what a sentence should be." (Id.) Claimant testified that he was able to count change, obtained a driver's license by oral examination, and attended vocational training for three or four years. (Id.)

Despite these deficiencies, the ALJ acknowledged that Claimant was a high school graduate and performed skilled work as a framing carpenter. (Tr. at 22.) Both Ms. Sayre and Mr. Steinhoff

18

opined that Claimant was capable of managing his own benefits and finances. (Id.) The ALJ further found that Claimant was capable of handling basic daily maintenance issues, conducting his own living arrangements, and making simple and independent decisions in his own best interest. (Id.) Furthermore, although the WRAT-4 results indicated elementary levels in reading, spelling, and arithmetic, Claimant's full scale IQ score was 82, which was indicative of borderline intellectual functioning by Ms. Sayre. Furthermore, at the administrative hearing, the VE testified that the jobs he identified would not be altered based upon a claimant performing math at a sixth grade level and reading at a second grade level. (Tr. at 50.) Consequently, even if the ALJ erred in finding that Claimant's educational abilities were consistent with his formal education, the VE accounted for Claimant's decreased abilities in reading, spelling, and math. Accordingly, the undersigned finds that any error the ALJ may have committed in finding that Claimant had a high school education and was able to communicate in English, is harmless.

2. *Mental RFC Assessment*:

Claimant next alleges that the ALJ erred in failing to account sufficiently for his moderate limitations in concentration, persistence, and pace. (Document No. 11 at 11-13.) Specifically, Claimant asserts that the ALJ's hypothetical question failed to account for these moderate limitations and that the ALJ failed to provide an adequate explanation for her RFC assessment. (Id. at 11-16.) "RFC represents the most that an individual can do despite his or her limitations or restrictions." See Social Security Ruling 96-8p, 1996 WL 374184, *1 (July 2, 1996). Pursuant to SSR 96-8p, the RFC assessment "must be based on all of the relevant evidence in the case record," including "the effects of treatment" and the "limitations or restrictions imposed by the mechanics of treatment; e.g., frequency of treatment, duration, disruption to routine, side effects of medication." Id. at *5. The Ruling requires that the ALJ conduct a "function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." Id. at *3. This

function-by-function analysis enables the ALJ to determine whether a claimant is capable of performing past relevant work, the appropriate exertional level for the claimant, and whether the claimant is "capable of doing the full range of work contemplated by the exertional level." Id. Looking at all the relevant evidence, the ALJ must consider the claimant's ability to meet the physical, mental, sensory and other demands of any job. 20 C.F.R. § 404.1545(a) (2014). "This assessment of your remaining capacity for work is not a decision on whether you are disabled, but is used as the basis for determining the particular types of work you may be able to do despite your impairment(s)." Id. "In determining the claimant's residual functional capacity, the ALJ has a duty to establish, by competent medical evidence, the physical and mental activity that the claimant can perform in a work setting, after giving appropriate consideration to all of her impairments." Ostronski v. Chater, 94 F.3d 413, 418 (8th Cir. 1996).

In determining a claimant's RFC, the ALJ "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." Id. at *7. The ALJ also must "explain how any material inconsistencies or ambiguities, in the evidence in the case record were considered and resolved." Id.

In Mascio v. Colvin, 780 F.3d 632, 636 (4th Cir. 2015), the Fourth Circuit observed that SSR 96-8p "explains how adjudicators should assess residual functional capacity. The Ruling instructs that the residual functional capacity 'assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions' listed in the regulations." It is only after the function-by-function analysis has been completed that RFC may "be expressed in terms of the exertional levels of work." Id. The Court noted that the ruling must include a narrative as to how the evidence supports each conclusion, citing specific medical facts and non-medical evidence. Id. The Fourth Circuit further noted that a

*per se* rule requiring function-by-function analysis was inappropriate "given that remand would prove futile in cases where the ALJ does not discuss functions that are 'irrelevant or uncontested." Id. Rather, the Fourth Circuit adopted the Second Circuit's approach that "remand may be appropriate...where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." Id. (*Citing* Cichocki v. Astrue, 729 F.3d 172, 177 (2d Cir. 2013)); see also, Ashby v. Colvin, Civil Action No. 2:14-674 (S.D. W.Va. Mar. 31, 2015).

In the instant case, the ALJ found that mentally, Claimant was capable of understanding, remembering, and carrying out one- and two-step commands that involved simple instructions in an environment that entailed only occasional and superficial interactions with others. (Tr. at 18.) In making this assessment, the ALJ further found that Claimant had mild limitations in maintain daily activities; moderate limitations in maintaining social functioning, concentration, persistence, or pace; and no episodes of decompensation of extended duration. (Tr. at 15-17.) Regarding concentration, persistence, or pace, the ALJ acknowledged Claimant's indications of continuing difficulties respecting memory function and his ability to attend, concentrate, and complete tasks. (Tr. at 17.) She further acknowledged his problems understanding and following directions, his formally diagnosed learning disorder, slowed thought processing, and somewhat limited general fund of knowledge. (Id.) She failed to assess marked limitations because Claimant's immediate and remote memory functions were within normal limits, he retained at least fair/average insight and judgment, he exhibited clear and coherent thought processing with the exception of his preoccupation with pain, he was oriented in all spheres, and he reported an ability to initiate, sustain, and complete daily tasks within his physical parameters. (Id.)

In assessing Claimant's RFC, the ALJ posed the following initial hypothetical question to the

21

VE:

> If you took an individual limited to light level work but could stand and walk a total of four hours of an eight hour day. Who could occasionally climb ramps or stairs, but never ladders, ropes or scaffolds.

> Occasionally balance, stoop, kneel, crouch, crawl. Should avoid concentrated exposure to temperature extremes, pulmonary irritants. Avoid even moderate exposure to vibrations and hazards.

> Is able to understand, remember and carry out one and two step commands involving simple instructions in an environment that entails only occasional and superficial interaction with others. Would such an individual be able to perform any of the past work of the claimant? …[W]ould there be other jobs such a person could perform?

(Tr. at 50-51.) The VE responded that such an individual was unable to perform Claimant's past relevant work but was capable of performing jobs such as a product inspector at the light level of exertion and as a machine monitor or product grader, sorter, and selector at the sedentary level of exertion. (Tr. at 51.) The ALJ then asked the VE to consider the same hypothetical, except that such an individual was able to perform math at a sixth grade level and read at the second grade level. (Id.) The VE responded that such limitation did not change the jobs identified. (Id.) Counsel subsequently asked the VE that if "the individual was off task because of pain and concentration issues up to 20 percent of - - or excuse me, 20 percent of the workday, would that person be able to perform the light jobs that you mentioned?" (Tr. at 51.) The VE responded that such a reduction would result in the inability of the individual to perform any jobs. (Id.)

In Mascio, the Fourth Circuit held that an ALJ does not account "for a claimant's limitations in concentration, persistence, and pace by restricting the hypothetical question to simple, routine tasks or unskilled work." Mascio, 780 F.3d at 638. The Fourth Circuit reasoned that "the ability to perform simple tasks differs from the ability to stay on task. Only the latter limitation would account for a claimant's limitations in concentration, persistence, or pace." Id. Consistent with the facts in Mascio, the ALJ here failed to account for Claimant's limitations in maintaining concentration,

persistence, or pace. Pursuant to the special technique, the ALJ determined that despite Claimant's moderate limitations in maintaining concentration, persistence, or pace,

> [h]e is observed as oriented in all spheres and he does report having the ability to successfully initiate, sustain, and complete simple, daily tasks within his physical parameters. As a whole, he presents as an individual who is able to understand, remember, and carry out one- and two-step commands involving simple instructions in an environment which entails only occasional and superficial interactions with others.

(Tr. at 17.) Thus, the ALJ explained the exclusion of the specific moderate limitations in her hypothetical question to the VE. Upon questioning by counsel however, the VE testified that if the hypothetical person was off task due to pain and concentration issues, up to 20 percent of the workday, that person was unable to perform any jobs. This District Court recognized in <u>Pritt v. Colvin</u>, Civil Action No. 5:13-cv-10036, 2014 WL 2818680, *15 (S.D. W.Va. June 3, 2014), that it was reasonable to conclude that the term "moderate" does not "mean anything less than 20% - 30% of the time at work." (internal citations omitted). Despite the VE's testimony, the ALJ failed to make any efforts to reconcile it with her contradictory RFC assessment. Accordingly, the undersigned finds that the ALJ failed properly to account for Claimant's moderate limitations in maintaining concentration, persistence, or pace when she assessed Claimant's RFC, and therefore, remand is required for further consideration of Claimant's mental RFC.

Accordingly, the undersigned finds that pursuant to the holding in <u>Mascio</u>, the ALJ failed to provide a well-reasoned narrative for her RFC assessment and that she failed to reconcile the inconsistency between the VE's testimony and her contradictory disability determination.

For the reasons set forth above, it is hereby respectfully **PROPOSED** that the District Court confirm and accept the foregoing findings and **RECOMMENDED** that the District Court **GRANT** the Plaintiff's Motion for Judgment on the Pleadings (Document No. 11.), **DENY** the

Defendant's Motion for Judgment on the Pleadings (Document No. 14.), **REVERSE** the final decision of the Commissioner, **REMAND** this matter pursuant to sentence four of 42 U.S.C. 405(g) for further administrative proceedings for further consideration of Claimant's impairments at step three of the sequential analysis, and **DISMISS** this matter from the Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Robert C. Chambers, Chief United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (mailing/service) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of de novo review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155, 106 S.Ct. 466, 475, 88 L.Ed.2d 435 (1985), reh'g denied, 474 U.S. 1111, 106 S.Ct. 899, 88 L.Ed.2d 933 (1986); Wright v. Collins, 766 F.2d 841, 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir.), cert. denied, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.Ed.2d 352 (1984). Copies of such objections shall be served on opposing parties, Chief Judge Chambers, and this Magistrate Judge.

The Clerk is directed to file this Proposed Findings and Recommendation and to send a copy of the same to counsel of record.

Date: May 20, 2016.

24

Omar J. Aboulhosn
United States Magistrate Judge